IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

PAIGE ROBERTS,

                Plaintiff,

      vs.

KILOLO KIJAKAZI, Acting Commissioner of Social Security,

                Defendant.

**8:22CV83**

**MEMORANDUM AND ORDER**

This matter is before the Court on motions for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner"). Filing No. 13; Filing No. 15. The plaintiff, Paige Roberts ("Roberts"), appeals a final determination of the Commissioner denying her social security disability benefits. This Court has jurisdiction under 42 U.S.C § 405(g) and § 1383(c)(3).

## BACKGROUND

### A. Procedural History

Roberts applied for disability insurance benefits on May 14, 2019. Filing No. 11-2 at 16. She claims a disability beginning on September 21, 2018. *Id.* Roberts alleges she suffers from osteochondritis dissecans, obesity, mood disorder, hypothyroidism, depression, and anxiety. Filing No. 11-5 at 2. The Social Security Administration denied Roberts's claims twice: first on December 10, 2019, then on reconsideration on January 29, 2020. Filing No. 11-2 at 16. Roberts requested an administrative hearing which occurred before an Administrative Law Judge ("ALJ") on November 16, 2020. *Id.* The ALJ denied her application for benefits after finding her capable of performing sedentary work and not disabled, for a second time, on December 11, 2020. *Id.* at 13. Roberts requested a review of the decision and the Appeals Council declined to review the ALJ's

ruling on January 11, 2022. *Id.* at 2. Upon the Appeal's Council's denial to review, the ALJ's decision became the final decision of the Commissioner. *Id.* Roberts filed this civil action seeking court review of the Commissioner's findings.

### B. Plaintiff Testimony

Roberts was born in 1986 and has a 12th grade education. Filing No. 11-10 at 13. She lives alone. *Id.* at 24. Roberts has no past relevant work experience. Filing No. 11-2 at 27. She has done some volunteer work at the Liberty Center, a clubhouse for the mentally ill. Filing No. 11-3 at 7. Roberts stated that from 2012 until 2020 she volunteered at the Liberty Center, part-time, five days a week for a total of eight hours each week and worked at the snack bar. *Id.* at 8. She was able to sit and stand as needed but there were times that she could not perform the tasks and someone else had to take over. *Id.*

Roberts stated that her primary physical impairment is her knee injury. *Id.* at 5. She has a long history of knee pain and currently uses a walker. *Id.* at 9. Roberts described the pain as a severe, sharp pain that is constant (24/7) in both knees. *Id.* She testified the knee pain impacts her ability to sit, stand, walk, lift, bend, squat, and climb. *Id.* at 13.

When attempting to sit, Roberts experiences sharp and throbbing pain. *Id.* at 9. She can sit with her feet flat on the floor for a maximum of ten minutes before she needs to move to alleviate the pain. *Id.* at 10. To do so, she either gets up and walks around, physically moves the pieces in her knee, or elevates her feet. *Id.* At this point, "nothing really helps the pain," and it leads to problems focusing and staying concentrated on tasks due to the pain. *Id.*

2

When standing, Roberts experiences a sharp, stabbing, throbbing pain in the entirety of both knees. *Id.* at 11. This pain will move all over, going down to her toes and up to her lower back. *Id.* She relieves this pain by laying down or sitting with her feet flat on the floor. *Id.* at 12.

Roberts also testified to physical limitations when walking, lifting, bending, squatting, and climbing. Filing No. 11-3 at 12–13. She can walk one block, but after that, must stop and sit for at least twenty minutes to rest. *Id.* at 12. Due to her knee pain, she has trouble lifting and cannot lift more than five pounds. *Id.* at 12–13. She also cannot bend or squat. *Id.* at 13. Lastly, in order to climb stairs, Roberts required railings on each side, and it would take time. *Id.*

In terms of household activities, Roberts is unable to very much cooking and cleaning. *Id.* at 15. She can stand to do the dishes for, at most, five minutes, and everything else she has help with. *Id.* Roberts receives help with daily tasks from her neighbor and father who clean and do her laundry. *Id.*

Roberts's physical conditions have worsened her mental health. *Id.* at 16. She has a diagnosis of depression and testified that she isolates herself because of her inability to do anything. *Id.* at 14. She has crying spells a few times a day and is very shy. *Id.* at 15. She further explained that she must lay down during the day because of pain, approximately three times a day for three hours total. *Id.* Roberts is not taking any pain medication or regularly seeing a doctor because she cannot afford it. *Id.* at 16.

### C. Vocational Expert Testimony

A Vocational Expert also testified at the hearing. Filing No. 11-3 at 19–22. The ALJ asked whether a worker of Roberts's education and experience could find work if the

hypothetical worker had no past relevant work, but has some abilities to perform work functions; able to perform sedentary work as defined in the DOT; able to perform work so long as it does not require kneeling, crouching, or crawling; can perform work that does not require sustained exposure to extreme cold, vibration or to hazards such as work at unprotected heights; able to understand remember and persist at a consistent pace while performing tasks that are simple, straightforward and uncomplicated; able to exercise judgement in performing those tasks and is able to respond appropriately to at least routine changes in the workplace and to routine supervision. *Id.* The Vocational Expert testified that there would be work available in the national economy as a document preparer, a polisher of eye frames, and an addresser. *Id.* at 20.

In response to further questioning by Roberts's attorney, the Vocational Expert admitted the same person would be unable to maintain competitive employment if he or she needed to walk around and needed to get up and leave the workstation every thirty minutes to relieve pain; explaining that if a person is off task ten percent (10%) of the day for any reason, he or she cannot be competitively employed. *Id.* at 21. The attorney then asked the Vocational Expert if it would be too much for this person to get up every half an hour, even if it was only for five minutes, to which the Vocational Expert reaffirmed that if someone is off task more than ten percent, that worker cannot maintain competitive employment. *Id.* Finally, the attorney asked what would happen if the individual needed to elevate their feet waist high four times a day for fifteen minutes each time. *Id.* The Vocational Expert explained that an individual requiring this would be able to maintain these sedentary jobs, but it would be an accommodation and not competitive employment. *Id.*

4

### D.  Medical Evidence

On December 19, 2016, Roberts saw Dr. Middleton for a medication check, general assessment, and mental status exam.  Filing No. 11-13 at 2.  Dr. Middleton diagnosed Roberts with (1) major depressive disorder, recurrent, moderate; (2) cannabis use disorder, in early remission; (3) obesity; (4) osteochondritis dissecans; and (5) hypothyroidism.  Id.  Roberts stated that at this time, she had no physical complaints, but her mood was mostly down, anxiety was at level 8, and concentration was just okay.  Id. at 2.  Dr. Middleton prescribed her Prozac.  Id. at 3.  On January 30, 2017, Roberts followed up with Dr. Middleton.  Id. at 4.  Roberts never filled the prescription for Prozac, and Dr. Middleton determined that Roberts "was doing well off any antidepressants" and "no longer needs medication management services."  Id.

On February 1, 2018, Roberts again saw Dr. Middleton for a general assessment, review of her diagnosis, and mental status examination.  Id. at 7.  In reviewing her symptom history, Dr. Middleton noted that Roberts experienced her first episode of depression that last at least two weeks at age eighteen and experienced "quite a few" episodes of depression with symptoms consistent with Major Depressive Disorder.  Id.  Dr. Middleton noted her condition caused "clinically significant distress or impairment in social, occupational or other important areas of functioning."  Id.  Her last major depressive episode occurred in December of 2017.  Id.

On July 8, 2018, Roberts visited Dr. Heller, her primary care provider, for a follow up on thyroid medication.  Filing No. 11-13 at 9.  Dr. Heller diagnosed Roberts with Hypothyroidism, Amenorrhea, Osteochondritis Dissecans, and Depression.  Id. at 10.  On her intake questionnaire, Roberts indicated she did not have uncontrolled worrying, was

5

not nervous, and was not currently in pain. *Id*. Roberts's charts reflected abnormal bilateral knee MRIs from January 1, 2012, that presented "extensive osteochondritis dissecans of the distal femur, suggesting osteochondritis dissecans, progressed from 2009." *Id*. at 11. She had a bilateral knee MRI on December 2, 2015, that showed osteochondral lesions, medial meniscal tear, mild patellofemoral arthrosis, joint effusion, and posterior loose body in the right knee. *Id*. The left knee showed old osteochondral lesions, medial and lateral femoral condyles, unchanged; small knee joint effusion; and small posterior loose bodies. *Id*. At this time, Dr. Heller's only treatment plan was for hypothyroidism, which he diagnosed as chronic and stable. *Id*. at 13.

On February 5, 2019, Roberts returned to Dr. Heller to receive an updated evaluation for disability due to knee pain. *Id*. at 15. Roberts reported to Dr. Heller she was denied disability because her paperwork/specialists notes were "too old", and she required an updated evaluation. *Id*. At this visit, Dr. Heller took bi-lateral knee x-rays and conducted a physical exam. *Id*. at 17. Dr. Heller noted that Roberts became tearful "during and after completing the exam of her knees." *Id*. at 19. Upon inspection, Dr. Heller observed that the knees "have somewhat irregular appearance bilaterally." *Id*. With palpitation, there were no areas with significant discomfort. *Id*. However, pain was elicited with "McMurray maneuver bilaterally" and "[l]igament testing and McMurray testing" was "slightly limited due to patient's pain." *Id*. Dr. Heller determined that Roberts's osteochondritis dissecans was "chronic and worsening." *Id*. at 20. At this time, his treatment plan included: 1) obtain repeat x-rays of the knees with images weightbearing and non- weightbearing; 2) follow-up with a repeat MRI of both knees, as

last MRI was approximately 2016; 3) orthopedic surgery consult after imaging; 4) Tylenol for pain; and 5) topicals such as Bio Freeze to help with swelling and discomfort. *Id*.

On February 9, 2019, Roberts returned to Dr. Heller to discuss the x-rays. Filing No. 11-13 at 23. Dr. Heller described Roberts as having "persistent progressive bilateral knee pain for many years," and reported that "she continues to have pain in both knees, difficulty ambulating, and increasing pain as the day progresses." *Id*. at 24. On her intake questionnaire, Roberts marked "yes" to currently in pain, describing the pain as moderate. *Id*. Roberts's bi-lateral knee x-ray reflected large bilateral joint effusions and irregularity of the medial and lateral formal condyles on both knees, but the left knee was worse than right. *Id*. at 25. Dr. Heller further noted that this appearance correlates with osteochondral defects on previous MRI exam. *Id*. He advised that Roberts initiate anti-inflammatory medicine and take prescribed Meloxicam; complete financial assistance paperwork; get an MRI of both knees; and follow up with orthopedic surgery after the MRI. *Id*. at 27.

On April 9, 2019, Roberts met with Dr. Brown, an orthopedic surgeon. Filing No. 11-13 at 71–73. Dr. Brown's physical exam of Roberts's knees revealed "significant tricompartmental pain and crepitus." *Id*. at 71. Dr. Brown noted that the MRI of her right knee showed "findings consistent with moderately advanced degenerative arthritis, degenerative meniscus tears, and osteochondral defects." *Id*. The MRI of the left knee showed "similar findings of multiple osteochondral deflects with complex meniscus tears." *Id*. Dr. Brown's ultimate impressions were advanced degenerative arthritis, bilateral knees, multiple osteochondral defects, bilateral knees, and morbid obesity (BMI 46). *Id*. at 72. Dr. Brown noted that Roberts's only surgical option would be to consider bilateral total knee replacement in the future. *Id*. However, he advised her to wait "at least until

7

age 40" and to "get her BMI under 40." *Id.* Dr. Brown suggested cortisone injections, which Roberts declined. *Id.* Dr. Brown noted that he "could not guarantee that she could return to any type of employment after the injections." *Id.* Dr. Brown started Roberts on a Medrol Dosepak and advised her to discuss her SSI disability issues with her PCP, Dr. Heller. *Id.*

On April 17, 2019, Roberts met with Dr. Heller for a follow up. Filing No. 11-13 at 29–35. Roberts reported that walking was becoming much more difficult and that she tried working a sit-down job again, but the pain made it difficult to do her job. *Id.* Dr. Heller described that "in essence, the patient has a hard time remaining focused on work due to pain whether it's upright or seated." *Id.* On her questionnaire, Roberts indicated she was in severe pain, that she had uncontrolled worrying, was nervous, anxious or on edge, had decreased pleasure, and had decreased mood. *Id.* at 30. Dr. Heller's assessment and treatment of Roberts's osteochondritis dissecans was "chronic and worsening." *Id.* at 34. He advised while corticosteroid injections may provide an "indeterminate amount of relief" it is "not anything that is going to cure her issue." *Id.* Further, Dr. Heller noted that he does not think that the injections would allow her to maintain long-term gainful employment. *Id.* Dr. Heller also noted that Dr. Brown offered Roberts a trial of oral steroids, however, she was unable to afford them, and that Roberts "is having significant difficulty that is progressive regarding her knees. At this time, it seems that her most reasonable option would be to reapply for disability status." *Id.*

On June 19, 2019, Roberts met with Dr. Heller to discuss pain medication. Filing No. 11-13 at 52. She stated was in pain all the time and wakes 4-5 times a night. *Id.* Roberts stated that her daily function decreased because the pain makes it difficult to

move and makes her depression worse.  *Id*.  Dr. Heller again noted that "both knees have irregular appearances," "she has pain and crepitus with extension and flexion," "there is pain to palpitation along the joint line bilaterally," "tenderness to palpitation of the patella bilaterally," and the exam was "limited by the patients pain."  *Id*. at 56.  Dr. Heller described Roberts's gait as "antalgic."  *Id*.  His assessment and treatment of Roberts's osteochondritis dissecans continued to be "chronic and worsening."  *Id*. at 57.  He advised starting Roberts on Hydrocodone for pain relief and to continue with Meloxicam for anti-inflammatory purposes.  *Id*.

On October 1, 2019, Roberts returned to Dr. Heller to discuss a medication refill for her thyroid and knee pain.  *Id*. at 59.  Roberts reported that her bilateral knee pain had caused her to have increased depression and anxiety and resulted in a couple episodes where she had to physically adjust her knee into place.  *Id*.  On her intake questionnaire, Roberts reported that her current pain was moderate, that the pain interferes with activities, that she had uncontrolled worrying, was nervous, anxious or on edge, and had decreased pleasure/mood.  *Id*. at 60.  Dr. Heller's assessment and treatment of Roberts's osteochondritis dissecans was again, "chronic and worsening."  *Id*. at 65.  He noted that Roberts "is planning on receiving a walker to help with ambulation around home this week;" and that Roberts's "condition is really stressful for [her].  I encouraged her to follow-up with her disability lawyer to have paperwork sent to this clinic sort may be completed that her case would be continued forward;" and to take ibuprofen and Tylenol, as needed.  *Id*.

On January 14, 2020, Dr. Heller completed a medical impairment evaluation for Roberts.  Filing No. 11-13 at 74.  Dr. Heller described her osteochondritis dissecans as

"severe," expected to span her lifetime, and disabling.  *Id.*  He described the condition as "progressive degeneration of both knee joints leading to increased pain with standing and walking.  Has pain that has progressed with activity."  *Id.*  He indicated that this condition would cause the claimant to be unable to perform her previous job or some other similar work, and performance of the claimant's former job or work have an adverse effect on her impairments noting that "osteochondritis dissecans is a progressive degenerative condition of her knees, prolonged walking, standing increases pain."  *Id.*  Dr. Heller noted that walking, standing, and weight-bearing were specific activities that may aggravate the condition.  *Id.* at 75.  He explained that the available treatment was bilateral total knee replacements, but that Roberts was too young for orthopedic surgery.  *Id.*  Dr. Heller further noted that the claimant's pain frequently interferes with attention and concentration and puts her off task.  *Id.*

Within the medical impairment evaluation, Dr. Heller listed that Roberts has pain in her knees; her knees catch, pop, lock; she has fallen; swelling of knees; foreign body in knees (right); and that she occasionally has to push to get the right knee to work so she can walk; and frequent use of a walker.  *Id.* at 76.

On Dr. Heller's Physical Capacities Evaluation, he indicated that in a workday with normal breaks, claimant's maximum workday was one hour and she would have to sit the full hour and could not be required to stand or walk.  Filing No. 11-13 at 77.  Dr. Heller noted that she could seldom lift up to 10 pounds, but could never bend, squat, crawl, or climb.  *Id.*  Additionally, if performing in a work setting, Roberts would need to be able to walk around and have the ability to leave the outside of scheduled breaks, approximately every thirty minutes and would require 10-15 minutes for each break.  *Id.* at 78.  Further,

Dr. Heller noted that Roberts would need to elevate her legs a maximum of 45 degrees, and that this would "vary with pain, maximum 4 times," taking "15-30 minutes." *Id*. Finally, he indicated that her maximum workload was "none." *Id*.

### E.  Consultative Reports

On August 8, 2019, Roberts met with a psychological consultant, Dr. Curran, a licensed psychologist, for a psychological interview.  Filing No. 11-13 at 42.  During the interview, Roberts discussed her depression and chronic knee pain.  *Id*. at 46.  Dr. Curran's diagnoses included major depressive disorder, recurrent, in partial remission; tobacco use disorder, severe; cannabis use disorder, mild, in early remission; and alcohol use disorder, severe, in sustained remission.  *Id*. at 48.  In terms of current functioning, Dr. Curran noted that "there does not appear to be a restriction of activities of daily living based on psychological findings."  *Id*.  He further indicated that Roberts appeared to "have the ability to sustain concentration and attention needed for task completion."  *Id*.  She would not, however, be able to carry out short and simple instructions under ordinary supervision as she would likely "need extra breaks to occasionally emotionally compose herself."  *Id*.  Dr. Curran wrote that "it was clear that the physical pain was primary, and it led to the emotional distress she is currently experiencing."  *Id*.

### F.  The ALJ's Findings

In evaluating Roberts's claim, the ALJ followed the sequential evaluation process for assessing disability claims.  Filing No. 11-2 at 16.  The ALJ found Roberts had not engaged in substantial gainful activity since May 14, 2019.  *Id*. at 18.  He determined Roberts suffered from the following severe impairments: degenerative joint disease of the knees, a thyroid disorder, obesity, and a mood disorder.  *Id*.  The ALJ asserted that the

combination of these conditions did not meet, or medically equal, the severity of listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Ultimately, the ALJ determined that Roberts had a residual functional capacity ("RFC") sufficient to perform sedentary work as defined in 20 CFR 416.967(a) with several additional limitations. *Id.* at 21.   The additional limitations precluded Roberts from kneeling, crouching, or crawling. *Id.*   Further, Roberts was limited to work that does not require sustained exposure to extreme cold, vibration, or hazard such as work at unprotected heights. *Id.*   Finally, she could work in a setting where the worker was permitted to use a cane when walking and was able to perform all lifting and carrying required by sedentary work by using the free hand alone. *Id.*   With these limitations and RFC established, the ALJ concluded Roberts could work as a document preparer, polisher of eye frames, or an addresser. *Id.* at 27.   Consequently, the ALJ found Roberts was not disabled. *Id.* at 18.

The ALJ did not afford great weight to Roberts's testimony because her statements about the "intensity, persistence, and limiting effects of her symptoms" were "not entirely consistent with the objective evidence contained in the medical evidence and other evidence of record, as well as the statements and other information provided by medical sources and others." *Id.* at 22.   Further, the ALJ asserted that the claimant's statements were not consistent with other relevant evidence including the claimant's report of "activities of daily living, measures taken to alleviate pain, and the location, duration, frequency, and intensity of pain." *Id.*   Additionally, the ALJ found there was no evidence in the record of "narcotic prescriptions, injections, emergent care, or inpatient treatment,"

or "use of an assistive device during appointments." *Id.* at 23.[1]   Accordingly, the ALJ concluded "[t]he record, which does evidence the claimant's complaints of knee pain and difficulty concentrating, does not support the claimant's extreme account of limitations, including her alleged utilization of a walker to assist with ambulation." *Id.* at 26.

The ALJ reviewed the opinions of Roberts's primary care physician, Dr. Heller, and found them "unpersuasive," as "they are neither consistent with nor supported by the medical evidence and other evidence of record." Filing No. 11-2 at 25.  The ALJ alleged Dr. Heller's assessment to be "internally inconsistent, extreme, and without factual foundation." *Id.*   The ALJ concluded Dr. Heller's assessment that Roberts's knee condition was disabling and that she would not be able to perform her previous job or other similar work, was an issue "reserved to the Commissioner" and required "consideration of vocational factors presumably outside of Dr. Heller's training and expertise." *Id.*

The ALJ reviewed the opinions of psychological consultative examiner, Dr. Curran, and found them "persuasive, as they are generally supported by and consistent with the medical evidence and other evidence of record, including his observations and the claimant's occasionally tearful presentation throughout the period at issue." Filing No. 11-2 at 25.  However, while Dr. Curran identified that the claimant "needed extra breaks to occasionally emotionally compose herself," ALJ asserted that "the record does not support a need for additional breaks." *Id.* at 26.

Alternatively, the ALJ found the medical opinions of the non-examining State agency medical consultants, Dr. Steven Higgins and Dr. Jerry Reed, to be "generally

---

[1] While the ALJ asserts the record lacks evidence of "narcotic prescriptions," on June 19, 2019, Dr. Heller noted "Start Roberts on Hydrocodone for pain relief." Filing No. 11-13 at 57.

persuasive," and "overall supported by and consistent with the medical evidence and other evidence of record." *Id.* at 24.

## DISCUSSION

### A. Law

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court's review is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011); *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). Substantial evidence "is 'more than a mere scintilla.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "It means—and means only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison*, 305 U.S. at 229).

However, this "review is more than a search of the record for evidence supporting the [ALJ or Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008). In determining whether there is substantial evidence to support the Commissioner's decision, this court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A). Accordingly, the Social Security Administration has promulgated a sequential process to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4). The determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity ("RFC") and his or her age, education, and work experience. At step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). At step two, the claimant has the burden to prove he or she has a medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities. *Id.* At step three, if the claimant shows that his or her impairment meets or equals a presumptively disabling impairment listed in the regulations, he or she is automatically found disabled and is entitled to benefits. *Id.* If not, the ALJ determines the claimant's RFC, which the ALJ uses at steps four and five. 20 C.F.R. § 404.1520(a)(4). At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*; see *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

A claimant's RFC is what he or she can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545. The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015). An ALJ's RFC determination (1) must give appropriate consideration to all of a claimant's impairments; and (2) must be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

To be supported by substantial evidence, an ALJ's RFC finding must be supported by a treating or examining source opinion. *See Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000); see also *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007). A claimant's RFC is a medical question and "'an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.'" *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quoting *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008). "The ALJ 'may not simply draw his own inferences about plaintiff's functional ability from medical reports.'" *Id.* (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)).

According to new Social Security Administration rules effective March 27, 2017, the ALJ need not grant any medical opinion controlling weight regardless of whether the opinion comes from a treating, examining, or consulting physician. 20 C.F.R. § 404.1520c. Instead, the ALJ must evaluate medical opinions according to 5 factors: (1)

Supportability, (2) Consistency, (3) Relationship to the claimant, which includes (i) length of the treatment relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship, and (v) examining relationship; (4) specialization, and (5) Other factors. *Id.* According to the rule, supportability and consistency are the most important factors and must be addressed by the ALJ in his or her decision. *Id.* Thus, while the new rules do not dictate the weight the ALJ is to ascribe to any given medical opinion, the ALJ is required to explain why she finds a medical opinion to be persuasive or not. *Dornbach v. Saul*, No. 4:20-CV-36 RLW, 2021 WL 1123573, at *3 (E.D. Mo. 2021). Therefore, the old standard that "when an ALJ discounts a treating [source's] opinion, she should give good reasons for doing so" still applies. *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

In determining whether to fully credit a claimant's subjective complaints of disabling pain, the Commissioner engages in a two-step process: (1) first, the ALJ considers whether there are underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the ALJ evaluates the claimant's description of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work. *Soc. Sec. Rul. 16-3p, 81 Fed. Reg. 14166-01, 2016 WL 1020935(F.R.)* (Mar. 16, 2016) (Policy Interpretation Titles II & XVI: Evaluation of Symptoms in Disability Claims). In the second step of the analysis, in recognition of the fact that "some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence[,]" an ALJ must "examine the entire case

17

record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *14168. To determine the intensity, persistence, and limiting effects of an individual's symptoms, the ALJ evaluates objective medical evidence, but will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. *Id.* However, the ALJ must not "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." *Id.* at *14169.

If an ALJ cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then the ALJ must carefully consider other evidence in the record—including statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in the Social Security regulations—in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. *Id.* Those factors include: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment an individual uses or has used

18

to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. *Id.* at *14169-70.

"An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole." *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998) (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)).   A claimant may have debilitating pain and still be able to perform some daily home activities. *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998) ("the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."); *see also Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005). "[The Eighth Circuit Court of Appeals] has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning, or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (quoting *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000)).   Allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications. *Id.*  Similarly, a failure to follow a recommended course of treatment also weighs against a claimant's credibility. *Id.*

In the fourth step of the sequential analysis, the ALJ considers whether a claimant's impairments keep her from doing past relevant work. 20 C.F.R. §404.1520(e). A claimant's RFC is the most that one can do despite his/her limitations. 20 C.F.R. § 404.1545.  The claimant is not disabled if the claimant retains the RFC to perform: "1) the

actual functional demands and job duties of a particular past relevant job; or 2) the functional demands and job duties of the occupation as generally required by employers throughout the national economy." *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996). During this step, an ALJ may consider the vocational expert's testimony when determining the claimant's RFC. *Wagner v. Astrue*, 499 F.3d 842, 853-54 (8th Cir. 2007). The ALJ often asks the vocational expert a hypothetical question to help determine whether enough jobs exist in the national economy that can be performed by a person with a similar RFC to the claimant. *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005).

A hypothetical question posed to a vocational expert as part of the RFC determination must be properly phrased to include all relevant impairments that are substantially supported by the record. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). If the hypothetical question does not include all relevant impartments, the vocational expert's testimony cannot constitute substantial evidence to support the ALJ's determination. *Id.*

This Court "review[s] the record to ensure that an ALJ does not disregard evidence or ignore potential limitations but [does] not require an ALJ to mechanically list and reject every possible limitation." *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011). An ALJ is not required to discuss all the evidence in the record to show that it was properly considered. *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). "Simply because a matter is not referenced in the opinion does not mean the ALJ failed to rely on the evidence in making his determination. However, this does not give an ALJ the opportunity to pick and choose only evidence in the record buttressing his conclusion." *Taylor ex rel. McKinnies v. Barnhart*, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004). An ALJ "must minimally articulate

his reasons for crediting or rejecting evidence of disability." *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir.1992)).

### B. Credibility

The ALJ reasoned that he did not afford great weight to Roberts's testimony because her statements about the "intensity, persistence, and limiting effects of her symptoms" were "not entirely consistent with the objective evidence contained in the medical evidence and other evidence of record, as well as the statements and other information provided by medical sources and others." Filing No. 11-2 at 22.  Though the ALJ acknowledged the record did evidence Roberts' "complaints of knee pain and difficulty concentrating," he stated it did not support her "extreme account of limitations, including her alleged utilization of a walker to assist with ambulation." *Id.* at 26.  Further, the ALJ relied on "imaging revealing mild to moderate osteoarthritis of the bilateral knees," in the context of "conservative treatment throughout the period at issue" to support the RFC.  *Id.*

The Court finds that the ALJ improperly evaluated Roberts's comments of disabling pain.  The ALJ must not "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the *degree* of impairment." Soc. Sec. Rul. 16-3p, 81 Fed. Reg. 14166-01, 2016 WL 1020935(F.R.).  Simply because the medical record fails to document Roberts's use of an assistive device during her appointments, does not reasonably lead to the conclusion that Roberts neither used a walker nor had trouble ambulating effectively.  *See* Filing No. 11-2 at 23.  Indeed, medical records from Dr. Heller note Roberts suffered from pain that "makes it difficult to move," and her MRI showed

"findings consistent with moderately advanced degenerative arthritis, degenerative meniscus tears, and osteochondral defects." Filing No. 11-13 at 52, 71. None of the objective medical evidence demonstrates Roberts could walk without pain after December 2018.

Social Security rules allow ALJs to consider the claimant's attempts to seek medical treatment and their persistence in following treatment when evaluating intensity and persistence of symptoms. Soc. Sec. Rul. 16-3p, 81 Fed. Reg. 14166-01, 2016 WL 1020935(F.R.). Continuing attempts to obtain relief evince persistent symptoms, and if "frequency or extent of treatment sought . . . is not comparable with the degree of the individual's complaint" the ALJ may deem the individuals subjective complains inconsistent with the record. *Id.* However, in such a case, the ALJ must consider possible reasons for the claimant to not seek treatment. *Id.* Possible reasons include undesirable side effects of prescription drugs, mental impairments, or financial constraints. *Id.* Further, the ALJ must "explain how [he] considered the individual's reasons in [his] evaluation of the individual's symptoms." *Id.*

The record directly and indirectly demonstrates that both finances and insurance acted as a barrier to Roberts obtaining medicine and treatment. Dr. Brown noted that he was aware of Roberts's "social situation." Filing No. 11-13 at 72. At the hearing, Ms. Schram explained Roberts's insurance difficulties and Roberts testified finance issues interfered with her ability to obtain medications and treatment. Filing No. 11-3 at 6, 16. Roberts further explained that her lack of insurance interfered with seeing an orthopedic surgeon. Filing No. 11-10 at 71. Yet, the ALJ failed to explain, or even mention, any possible reasons why Roberts reduced her attempts at seeking treatment or pursuing a

22

more conservative approach to treatment.  This omission directly violates Social Security Rule 16-3p.

The ALJ incorrectly characterized Roberts as "mild to moderate osteoarthritis of the bilateral knees."  Filing No. 11-2 at 26.  The medical record does not support this assertion.  Dr. Brown explained the imaging showed moderately advanced degenerative arthritis, degenerative meniscus tears, and multiple osteochondral defects in the right knee and similar findings in the left.  Filing No. 11-13 at 71.  Further, the findings were consistent with "advanced degenerative arthritis deformities in both of her knees" and not just mild to moderate findings as characterized by the ALJ.  Id.  Due to the severity of Roberts's condition, both Dr. Heller and Dr. Brown noted that the only long-term solution was a bi-lateral knee replacement.  Id. at 72.

Because the ALJ 1) failed to support his decision to disregard Roberts's consistent complaints of pain while sitting, without addressing the possible reasons she stopped pursuing treatment; 2) did not acknowledge factors such poverty, precipitating or aggravating factors, type, dosage effectiveness and side effects of medication, or other measures Roberts takes to alleviate pain; and 3) incorrectly characterized the nature of the injury, the ALJ improperly discredited Roberts's subjective descriptions of her functional limitations.

### C.  Treating and Consulting Physicians

"The ALJ must give 'controlling weight' to a treating physician's opinion if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'"  *Papesh*, 786 F.3d at 1132 (quoting *Wagner v. Astrue*, 499 F.3d 842, 848–49 (8th Cir. 2007).  Even if not entitled to controlling

weight, a treating physician's opinion "should not ordinarily be disregarded and is entitled to substantial weight." *Papesh*, 786 F.3d at 1132 (quoting *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007). The regulatory framework requires the ALJ to evaluate a testing source's opinion in consideration of factors such as length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating source. *See* 20 C.F.R. § 404.1527(c)(2). "When an ALJ discounts a treating physician's opinion, the ALJ should give 'good reasons' for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (quoting *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002)).

Recently, the Social Security Administration amended and reorganized the regulations and 20 C.F.R. §§ 404.1527 and 416.927 have been superseded by 20 C.F.R. §§ 404.1520c and 416.920c for claims filed after March 27, 2017. *See Seay v. Berryhill*, No. 5:16-CV-05096-VLD, 2018 WL 1513683, at *39 (D.S.D. Mar. 27, 2018). According to new Social Security Administration rules effective March 27, 2017, the ALJ need not grant any medical opinion controlling weight, regardless of whether the opinion comes from a treating, examining, or consulting physician. 20 C.F.R. § 404.1520c. Instead, the ALJ must evaluate medical opinions according to 5 factors: 1) Supportability; 2) Consistency; 3) relationship to the claimant, including (i) length of the treatment relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship, and (v) examining relationship; (4) specialization, and (5) other factors. *Id.* According to the rule, supportability and consistency are the most important factors and must be addressed by the ALJ in his or her decision. *Id.* Thus,

while the new rules do not dictate the weight the ALJ is to ascribe to any given medical opinion, the ALJ is required to explain why she finds a medical opinion to be persuasive or not. *Dornbach v. Saul*, No. 4:20-CV-36 RLW, 2021 WL 1123573, at *3 (E.D. Mo. Mar. 24, 2021). Therefore, the old standard that "when an ALJ discounts a treating [source's] opinion, she should give good reasons for doing so," still applies. *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

The Court finds that the ALJ erred in affording only little weight to the opinion of Dr. Heller, because of the alleged inconsistencies with the other evidence in the record. Filing No. 11-2 at 25. The ALJ acknowledged Dr. Heller's record of Roberts's history of knee pain. *Id.* However, the ALJ stated that Dr. Heller's opinions were unpersuasive, reasoning the conclusions were "internally inconsistent, extreme, and without factual foundation." *Id.* The Court finds that Dr. Heller's opinion and evidence overwhelmingly supports Roberts's claim of disability, as previously stated herein.

The Court further finds that the ALJ erred in finding Dr. Curran's consultative only partially persuasive. The ALJ found Dr. Curran's opinions persuasive, except clarified, "the record does not support a need for additional breaks." *Id.* at 26. Roberts's need for additional breaks is well supported by the record. Dr. Curran observed that Roberts's knee pain led to emotional distress. Filing No. 11-13 at 48. An extra breaks limitation due to pain was consistent with Dr. Heller's opinions. *Id.* at 78. The ALJ erred in failing to articulate sufficient reasons for finding Dr. Curran's opinions unpersuasive.

### D. Vocational Expert

25

In the fourth step of the sequential analysis, the ALJ considers whether a claimant's impairments keep him from doing past relevant work. 20 C.F.R. § 404.1520(e). A claimant's RFC is the most that one can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). The claimant is not disabled if the claimant retains the RFC to perform: "1. The actual functional demands and job duties of a particular past relevant job; or 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy." *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996) (quoting Soc. Sec. Ruling 82-61). During this step, an ALJ may consider the vocational expert's testimony when determining the claimant's RFC. *Wagner*, 499 F.3d at 853–54. The ALJ often asks the vocational expert a hypothetical question to help determine whether a sufficient number of jobs exist in the national economy that can be performed by a person with a similar RFC to the claimant. *Guilliams*, 393 F.3d at 804.

A hypothetical question posed to a vocational expert as part of the RFC determination must be properly phrased to include all relevant impairments that are substantially supported by the record as a whole. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). If the hypothetical question does not include all relevant impartments the vocational expert's testimony cannot constitute substantial evidence to support the ALJ's determination. *Id.*

At the ALJ hearing, the ALJ asked the Vocational Expert whether a hypothetical worker with Roberts's education and experience, and Roberts's general physical and mental issues, could find work. Filing No. 11-3 at 20. The Vocational Expert testified that there would be work available in the national economy as a document preparer, a polisher of eye frames, and an addresser. *Id.*

When Roberts's attorney asked the Vocational Expert the same question, but with the caveat that the hypothetical worker had the *same* physical needs and restrictions as Roberts, the Vocational Expert admitted the same person would *not* be able to maintain competitive employment, and further explained that if a person is off task ten percent (10%) of the day for any reason, the worker could not maintain competitive employment. Filing No. 11-3 at 21.   Finally, Roberts's attorney asked what would happen if the individual needed to elevate his or her feet waist high four times a day for fifteen minutes each time. *Id*.   The Vocational Expert explained that if an individual required this, he or she would be able to maintain these sedentary jobs, but it would be an accommodation and not competitive employment. *Id*.

The Court finds that the job suggestions provided by the Vocational Expert are inadequate because they are based on hypothetical questions from the ALJ to the Vocational Expert which did not consider all relevant impartments.  Those jobs are for individuals who can sit for long periods of time, which Roberts cannot do.  Further, the Vocational Expert clearly determined that Roberts could not perform jobs in the national economy if she had to leave the workstation every thirty minutes or was off task ten percent of the day.

## CONCLUSION

The clear weight of the evidence points to a conclusion that Roberts has been disabled since her claimed onset date of September 21, 2018.  "Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate." *Hutsell v. Massanari*, 259 F.3d 707, 714 (8th Cir. 2001) (quoting *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984).

THEREFORE, IT IS ORDERED THAT:

1. The plaintiff's motion to reverse, Filing No. 13, is granted;

2. The defendant's motion to affirm, Filing No. 15, is denied;

3. The decision of the Commissioner of the Social Security Administration is reversed;

4. This action is remanded to the Social Security Administration for an award of benefits; and

5. A separate judgment will be entered in accordance with this memorandum and order.

Dated this 25th day of April, 2023.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

28